# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.          14-cv-2231-RM-MEH

Jonathan SHIELDS, Steven CHRISTIANSEN, Misty CHRISTIANSEN, S.C. (by and through her next friend Misty Christiansen), James KERNS, Eric PETERSEN, Wesley SPECHT, Jessica SPECHT, Ashley CLARK, Christopher CLARK, THOMAS SPITZ, David ZAYATZ, Erin McCLANAHAN,  R.M. (by and through her next friend Erin McClanahan), Earl COOLEY, Harold Dean GROVES and Marsha GROVES,

     **PLAINTIFFS**

v.

Jennifer DUNCAN (in her personal and official capacities as Jonathan Shields' parole officer); Theresa DAWES (in her personal capacity as Steven Christiansen's parole officer); Shefali PHILLIPS (in her official capacity as Eric Petersen's parole officer), Kyli SIMMS (in her official capacity as Thomas Spitz' parole officer), Amy TATE (in her personal capacity as James Kerns' parole officer), Michelle SAGE (in her official capacities as Earl Cooley's parole officer); Matt CAREY (in his official capacity as David Zayatz' parole officer); Matthew SULLIVAN (in his personal capacity for damages); Miranda KINNETT (in her personal capacity for damages), Rick RAEMISCH (in his official capacity as Executive Director of the Colorado DOC), Robert LUNG (in his official capacity as Arapahoe County District Court Magistrate); Cheryl TERNES (in her official capacity as the Director of the Arapahoe County Department of Human Services); Kelly HOLTZ (in her personal and official capacities, Arapahoe County Department of Human Services case worker); Sarah YARBROUGH (in her personal and official capacities as GAL); Alison BETTENBERG (in her personal and official capacities as GAL); Chris KLINE (in her official capacity as the Director of the Adams County Department of Human Services); Amanda JURDEN (in her personal capacity for damages, Adams County Department of Human Services case worker); Chad HERRERA (in his personal capacity for damages, Adams County Department of Human Services case worker ); Caire KROL (in her official capacity as Supervisor for Adams County Department of Human Services Child Abuse Records and Appeals Programs); Rick SHILLING (in his personal capacity for damages, Adams County Department of Human Services case worker); Marcelo KOPCOW (official capacity as SOMB Board Member), Erin JEMISON (official capacity as the SOMB Board Chair), Mary BAYDARIAN (official capacity as SOMB Board Member), Carl BLAKE (official capacity as SOMB Board Member), Allison BOYD (official capacity as SOMB Board Member), A. Mervyn DAVIES (official capacity as SOMB Board Member), Cheryl DAVIES (official capacity as SOMB Board Member), Jessica CURTIS (official capacity as SOMB Board Member), Amy FITCH (official capacity as

SOMB Board Member), Jeff GEIST (official capacity as SOMB Board Member), Missy GURSKY (official capacity as SOMB Board Member), Peggy HEIL (official capacity as SOMB Board Member), William HILDEBRAND (in his official capacity as SOMB Board Member), Nancy JOHNSON (official capacity as SOMB Board Member), Jeff JENKS (official capacity as SOMB Board Member), Dianna LWYER-BROOK (official capacity as SOMB Board Member), Tom LEVERSEE (official capacity as SOMB Board Member), Richard BEDNARSKI (official capacity as SOMB Board Member), John ODENHEIMER (in his official capacity as SOMB Board Member), Jessica MEZA (official capacity as SOMB Board Member), Angel WEANT (official capacity as SOMB Board Member), Mimi SCHEUERMANN (official capacity as SOMB Board Member), Doug STEPHENS (official capacity as SOMB Board Member),   Brandon SHAFFER, (official capacity as Colorado Parole Board Member), Rebecca OAKES, (official capacity as Colorado Parole Board Member), Denise BALAZIC (official capacity as Colorado Parole Board Member), Joe MORALES (official capacity as Colorado Parole Board Member), John O'DELL (official capacity as Colorado Parole Board Member), Alfredo PENA (official capacity as Colorado Parole Board Member), Marjorie LEWIS (official capacity as Colorado Parole Board Member); Min U KIM a//k/a Soo KIM or Kim SOO, doing business as CARRIAGE MOTOR INN at 9201 E Colfax Ave, Aurora CO  80010; MOTEL 9 LLC and COMMUNITY EDUCATION CENTERS INC.

**DEFENDANTS**

_____

## THIRD AMENDED COMPLAINT FOR DAMAGES, DECLARATORY and INJUNCTIVE RELIEF and JURY DEMAND

_____

The Plaintiffs, by and through their attorney, Alison Ruttenberg, submits their Third Amended Complaint against the Defendants.  The Plaintiffs are all designated or convicted sex offenders who are incarcerated in the Department of Corrections, have been paroled or have been successfully discharged from their parole sentences, and their family members.

This lawsuit is about how the Sex Offender Management Board (the SOMB) promulgated an unconstitutional policy, based on no legitimate peer reviewed scientific evidence, that all sex offenders are forever a danger to any child.  This policy, as applied to the Plaintiffs, violates their Fourteenth

2

Amendment right to familial association.    The SOMB applies this policy regardless of the original victim, the age and gender of the victim, and the time that has elapsed since the offense.  This policy is applied as a blanket prohibition against any sex offender having any contact with anyone under the age of 18 (even the sex offenders own children and grandchildren), and also includes indirect or third party contact (so the sex offender is not even allowed to talk to his spouse or adult children about his children or grandchildren).    This unconstitutional policy has been blindly applied in the same manner by other state agencies, including the Department of Corrections (DOC) the Colorado parole board, all adult community parole officers in Colorado, various police departments and the Adams and Arapahoe County Human Services Departments (DHS).    Police Departments and DHS officials misappliy this unconstitutional policy to harass sex offenders who have discharged their sentences by taking their children away or threatening to take their children away for no other reason than the irrational and unconstitutional conclusion that it is per se neglect and abuse for a convicted sex offender to parent his children or have contact with his grandchildren.  Police officers in various jurisdictions will arrest sex offenders, who have completely discharged their sentences, for no other reason than they think that because of the SOMB's unconstitutional policy, then it is a crime for a registered sex offender to be in the presence of children. Registered sex offenders, who have completely discharged their sentences, are being dragged down to police stations after being seen in the presence of children, only to be released once the ignorant and untrained police officers

realize that the SOMB "policy" is not a codified statute and it is not a crime for a sex offender to be in the presence of children. This harassment and abuse of sex offenders and their family members will continue unless the federal court enjoins the SOMB's unconstitutional policy and holds other state officials personally responsible for the misapplication of this unconstitutional policy, which has resulted in the harassment of hundreds of sex offenders who have done nothing to warrant this harassment, and has resulted in dozens of families being torn apart and numerous suicide attempts by the affected children. Numerous children or grandchildren of sex offenders attempt suicide because state officials (such as the named parole officers, parole board members, DHS case workers, GALs who are supposed to be acting in the children's best interests) continue to tear families apart and remove children from their homes or deny families to be together for no reason other than their ignorant and irrational fear that all sex offenders pose a danger to all children at all times for the rest of their lives. It is a proven fact that sex offenders have the lowest rate of recidivism than any other category of convicted felon; yet it is only sex offenders who have to register for the rest of their lives, are subject to having their children taken away for no reason other than the fact that they have a sex offence conviction decades in the past and are subject to this continued irrational fear that all sex offenders will always reoffend against any child at any time. Convicted murders, child abusers, drug dealers and others who put children in harms way are not subject to this scrutiny and are allowed to live their lives after they complete their sentences without having to worry that their children will be taken away or without having to

4

worry that they will be arbitrarily and capriciously denied the ability to live with their family members.

## JURISDICTION OF THE COURT

1.    This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 USC §1983.  Jurisdiction is conferred on this Court pursuant to Title 28 USC §1331.  Jurisdiction supporting the Plaintiffs' claim for attorney fees and costs is conferred by 42 USC §1988. Supplemental jurisdiction over pendent causes of action against the Community Education Centers, Inc. and Motel 9 for state law causes of action (which arise out of the common nucleus of operative facts as Mr. Shields' and Mr. Christensen's federal civil rights claim) are conferred by 28 USC §1367.

2.    Venue is proper in the District of Colorado pursuant to 28 USC §1391(b).  All of the events relevant to the claims set forth in this Complaint occurred within Jefferson, El Paso and Denver Counties, Colorado.

## PARTIES, PARTICIPANTS AND FACTS

3.    At all times material to this Complaint, the Plaintiffs are all prisoners or former prisoners of the Colorado Department of Corrections ("DOC") in either a DOC facility, a private facility that contracts with the DOC or on parole or are their family members.  Ashley Clark is Christopher Clark's wife.  Jessica Specht is Wesley Specht's wife.  Misty Christiansen is Steven Christensen's wife.  S.C. is their two year old daughter.  Erin McClanahan is David Zayatz long time girlfriend, and the mother of their ten year old daughter R.M.  Marsha Groves is Harold Dean Groves' wife.  Melissa Hessler is Marsha's daughter and Dean's

5

step-daughter.  Tammy Bruntz is Marsha's former sister-in-law and is Melissa's paternal aunt.  Melissa is the biological mother of J.M. and T.T., the Groves two grandsons, and Tammy Bruntz is their temporary guardian.  The Plaintiffs who are or were offenders are either convicted sex offenders, were designated as sex offenders by the DOC or in the case of Christopher Clark treated as if he was a designated sex offender.  As a result, they have been denied their Fourteenth Amendment right to familial association with their family members or otherwise have arbitrary and capricious restrictions placed upon them by their parole officers and/or the parole board without procedural due process.

4.      Jennifer Duncan is a Department of Corrections Community Parole Officer, and has been Mr. Shields' parole officer from 2012 to the present.  She is sued in her personal capacity for damages, and in her official capacity for prospective injunctive and declaratory relief.  At all times material to the allegations in this complaint, she was acting under color of state law.

5.      Theresa Dawes is a Department of Corrections Community Parole Officer, was Mr. Christiansen's parole officer from May 19, 2014 until his discharge from parole on or about April 7, 2015.  She is sued in her personal capacity for damages.  At all times material to the allegations in this complaint, she was acting under color of state law.

6.      Shefali Phillips is a Department of Corrections Community Parole Officer, and has been Mr. Petersen's parole officer since approximately July 2014.  She is sued in her official capacity for prospective injunctive and

declaratory relief.  At all times material to the allegations in this complaint, she was acting under color of state law.

7.    Kyli Simms is a Department of Corrections Community Parole Officer, and has been Mr. Spitz' parole officer at all material times.  She is sued in her official capacity for prospective injunctive and declaratory relief.  At all times material to the allegations in this complaint, she was acting under color of state law.  Matt Carey is a Department of Corrections Community Parole Officer, and has been Mr.Zayatz' parole officer at all material times since he was extradited to Colorado in 2015.  He is sued in his official capacity for prospective injunctive and declaratory relief.  At all times material to the allegations in this complaint, he was acting under color of state law.

8.    Amy Tate is a Department of Corrections Community Parole Officer, and was Mr. Kerns' parole officer at all material times when he was on parole from November 24, 2014 - February 12, 2015.  She is sued in her personal capacity for damages for denying Mr. Kerns the ability to live with his family because there were minors in the home.  The law was clearly established by *United States v. Bear*, 769 F.3d 1221 (10th Cir. October 31, 2014) in the Tenth Circuit by November 24, 2014 that a sex offender cannot be barred from having contact with his minor family members simply because of a decades old sex offense.    At all times material to the allegations in this complaint, Ms. Tate was acting under color of state law.

9.    Michelle Sage is a Department of Corrections Community Parole Officer, and has been Mr. Cooley's parole officer at all material times when he

was on parole from June 25, 2014 - present.   She is sued in her official capacity for prospective injunctive relief.   At all times material to the allegations in this complaint, Ms. Tate was acting under color of state law.

10.     Matthew Sullivan and Miranda Kinnett are officers or employees of the Mesa County Criminal Justice Services Department, which is responsible for administering the Mesa County Community Corrections Facility (a DOC halfway house).   The Mesa County Community Corrections Facility houses DOC prisoners on parole (as well as other persons with felony convictions who were sentenced directly to Community Corrections as an alternative to the DOC). Christopher Clark has been a prisoner at the Mesa County Community Corrections Facility at all times material to this complaint, and Matthew Sullivan and Miranda Kinnett were the two officers who made the decision that Christopher and Ashley Clark could not have any contact at all with each other from March - June 2014 and could not live with each other from October 2014 - the present when Christopher transitioned into the community.   They are sued in their personal capacity for damages.   At all times material to the allegations in the this complaint pertaining to Ashley and Christopher Clark, Matthew Sullivan and Miranda Kinnett were acting under color of state law.

11.     Rick Raemisch is the Executive Director of the Colorado DOC, and is sued in his official capacity for prospective injunctive and declaratory relief.   At all times material to the allegations in this complaint, he was acting under color of state law.

8

12.    Cheryl Ternes is the Director of the Arapahoe County Department of Human Services (DHS), and Chris Kline is the Director of the Adams County Department of Human Services.  They are sued in their official capacities for prospective injunctive and declaratory relief and at all times material to this complaint, were acting under color of state law.  Kelly Holtz is an Arapahoe County DHS case worker assigned to the case of Marsha and Harold Groves' grandsons (who are Melissa Hessler's sons).  Alison Bettenberg and Sarah Yarbrough are the appointed GALs for these two children.  Ms. Holtz, Ms. Bettenberg and Ms. Yarbrough are sued in their personal capacities for damages and official capacities for prospective injunctive relief.  At all times material to this complaint, Ms. Holtz was acting under color of state law.  At all times when Ms. Bettenberg and Ms. Yarbrough acted or purported to act pursuant to the authority delegated to them by the District Court in Arapahoe County Court case number 14JV1430 or pursuant to the authority they claim has been delegated to them by the Arapahoe County District Court, they acted under color of state law.  Amanda Jurden, Chad Herrera and Rick Shilling are Adams County DHS case workers who at various times purported to act under color of state law to deprive the Christensen family of their Fourteenth Amendment right to familial association and are sued in their personal capacities for damages.  Caire Krol is the Supervisor for Adams County Department of Human Services Child Abuse Records and Appeals Programs, and she acted under color of state law when she entered certain negative records and reports in official government files and records systems (called "red flags") against Misty and Steven Christensen, which

9

will cause them adverse consequences for the rest of their lives. These "red flags" were entered for no other reason than the Adams County DHS concluded that Misty and Steven Christensen abused and neglected their daughter S.C. for no reason other than the fact that Mr. Christensen is a sex offender with a decades old conviction. There is zero evidence that the Christensens ever neglected or abused their daughter. She is sued in her official capacity for prospective injunctive and declaratory relief.

13. The Parole Board Members are sued in their official capacity for prospective injunctive and declaratory relief. The parole board members act under color of state law when they place restrictions on parolees or revoke their parole based upon the allegations of parole officers.

14. The SOMB Defendants are the board members and chair of the Colorado Sex Offender Management Board ("SOMB"). They are sued in their official capacities for injunctive and declaratory relief; and when promulgating standards and guidelines or otherwise instructing probation and parole officers and community treatment providers, they are acting under color of state law. The SOMB has promulgated policies for the treatment of sex offenders at the DOC and while in community treatment programs on probation or parole.

a. In 1992, the Colorado General Assembly passed legislation that created the SOMB in the Division of Criminal Justice. The SOMB was charged to develop standards and guidelines for the evaluation, treatment, and behavioral monitoring of sex offenders. Currently, the SOMB consists of personnel representing the following domains: the department of

corrections, the judicial department, law enforcement, the public defender's office, private criminal defense attorneys, rural and urban county commissioners, clinical polygraph examiners, the department of public safety, district attorneys, department of human services, licensed mental health professionals with expertise in treating sex offenders, the victim services community, and community corrections.   The General Assembly created the SOMB as a means of managing the evaluation and treatment of sex offenders. *People v. Brosh*, 251 P.3d 456, 460 (Colo. App. 2010); CRS 16-11.7-103(1). Among other things, the SOMB is tasked with "develop[ing], implement[ing], and revis[ing], as appropriate, guidelines and standards to treat adult sex offenders."   CRS16-11.7-103(4)(b).

b.      The SOMB has promulgated a document called  "standards and guidelines for the assessment, evaluation, treatment and behavioral monitoring of adult sex offenders;" hereinafter referred to as the "SOMB guidelines."  The SOMB guidelines apply to sex offenders who meet the SOMB definition of a "sex offender," and there is no authority in the guidelines for applying the guidelines to any other offender that does not meet the definition.   Despite being called "guidelines," parole and probation officers, and community and DOC treatment providers interpret the promulgations of the SOMB as having the force and effect of a statute. The SOMB "guidelines" are poorly researched, not based on peer-reviewed scientific research and are largely based on Defendant Peggy

11

Heil's personal publications, which are not peer reviewed and/or based on publications by victim's advocacy groups. Heil has little support for many of her assertions, and will (for example) cite to having seen something on a poster at a seminar as "authority" for what is set forth in the SOMB guidelines.

c. The SOMB is the final policymaking authority for the state of Colorado regarding the treatment and behavioral monitoring of sex offenders, whether on probation, on parole or confined in the Colorado Department of Corrections.

d. In 2012, the General Assembly ordered the Department of Corrections to engage an independent evaluation team to thoroughly evaluate the sex offender treatment program. The report by the independent evaluators was released on February 1, 2013 and is a highly critical condemnation of Colorado's sex offender treatment program and applies equally to the community based treatment providers that treat the probationers and parolees and the treatment providers that provide treatment to DOC inmates. In particular, this independent evaluation condemned the "one sized fits all" policy of the SOMB of treating all sex offenders alike, without regard to the age and gender of the offender or the age, gender or number of alleged victims or the nature of the offense or whether violence or a weapon was used in the commission of an offense. This "one sized fits all" policy treats all sex offenders as serial pedophiles, who place all children in the community at risk of sexual

assault, without regard to whether a particular offender has ever committed a sex assault on a child or even has pedophiliac tendencies.

15.    According to the Colorado Secretary of State, Carriage Motor Inn was registered on January 1, 2001 by a Korean named Min U Kim.  Min U Kim registered the trade name "Carriage Motor Inn" under which he transacts business in the state of Colorado, and this registration was renewed on or about December 16, 2011.  Upon information and belief, the current market value of Carriage Motor Inn is $1,056,000 and the annual property tax is $8,549.25 per year.  On or about February 1, 2000 a person named Sue Hayes quit claimed this property, and sold it in January 2001 to Min U Kim (aka Kim Soo or Soo Kim) through another Korean individual named Ki C Choi.  For ease of reference, the Defendant in this Complaint shall be hereinafter referred to as "Mr. Kim" or "Carriage Inn."  Mr. Kim took out a $750,000 equity line of credit on or about April 2, 2003.  Mr. Kim is the owner of the Carriage Motor Inn and is a landowner within the meaning of CRS 13-21-115.  Mr. Kim still owns and operates the Carriage Motor Inn.  Mr. Kim is a slum lord who makes a living by preying on destitute individuals who have been paroled from the Department of Corrections. He contracts with the Parole Board/ Colorado Department of Corrections, to provide temporary housing to parolees who parole to the Denver metro area.  For all felonies committed on or after July 1 1993, if the offender receives a DOC sentence, then every such sentence must include a mandatory term of parole.  If the offender is homeless, then the parole officer must provide temporary housing, and will pay for 2-4 weeks of housing at a motel to give the chance for the

13

offender to find employment and a place to live. According to the parole department, Mr. Kim has an exclusive contract with the DOC parole division to house all indigent parolees who have been paroled from an Adams County sentence. However, this is not true, and cannot be used as the excuse to refuse to move Mr. Shields to a different motel. Mr. Christiansen was placed in a different motel on Colfax when he was paroled as homeless, even though he is an Adams County sex offender. Mr. Kim, who provides housing to desperate men and women, who have no where else to turn, and are powerless to stand up to landlords who take advantage of them and provide uninhabitable rooms. Mr. Kim does not give parolees, who are forced to live in his motel, clean linens, and he makes the parolees clean his motel every morning so that he does not have to hire people to clean. The parolees are too intimidated to complain about Mr. Kim, and Mr. Kim threatens to report them to their parole officers, and this is how he keeps them in line and from complaining about his uninhabitable motel. Mr. Shields has settled his claims against the Carriage Inn, and this defendant will be dismissed as soon as the Carriage Inn complies with the settlement agreement.

16.     Motel 9, LLC ("Motel 9") is a limited liability company formed by Daniel Kim to operate a Motel 9 motel at 8701 East Colfax Avenue, Denver Colorado. Mr. Kim is located at 5790 S. Kenton Way, Greenwood Village CO 80111. The Motel 9 at this address was previously the trade name of an entity called Nice Plaza Inc. with registered agent Ky Truong at 8701 East Colfax Ave. That trade name registration has expired and it appears that Nice Plaza Inc. no longer has any ownership or interest in the Motel 9 at 8701 East Colfax Ave.

14

Motel 9 is a landowner within the meaning of CRS 13-21-115.  Motel 9 at 8701 East Colfax Ave is also a slum lord making a living off of preying on destitute individuals who have been paroled from the Department of Corrections.  This motel is also infested with rodents, bed bugs and other vermin and many rooms do not have bathrooms that have operational plumbing.  Motel 9 contracts with the DOC division of adult parole to incarcerate indigent parolees.  Motel 9 has defaulted after being served with the Second Amended Complaint and Mr. Christensen will file his motion for default judgment.

17.     Community Education Centers Inc. ("Phoenix Center") is the Trade Name for a non profit corporation that runs the Adams County Community Corrections at 8031 I-76 Service Road in Henderson Colorado 80640. Phoenix Center is a "half way" house.  Offenders are placed in his "half way" house after being accepted by the Adams County Community Corrections Board and are screened for placement by either parole officers or Courts.  However, it is a private entity and no Court can force the Phoenix Center to accept any particular offender.

## FACTUAL BACKGROUND

### Jonathan Shields

18.     Jonathan Shields is a juvenile offender who was charged as an adult with various third class and fourth class sex offenses and other felonies, in Adams County District Court case 2005CR1163, for actions against his cousins that allegedly took place in 2002 when he was seventeen.    The Attorney General's office takes the disingenuous position that Mr. Shields is not a juvenile

offender because he no longer is a juvenile, and was not a juvenile when he was sentenced. This is factually and legally incorrect; Mr. Shields is a juvenile offender within the meaning of *Miller v. Alabama,* 132 S.Ct. 2455 (2012), *Jackson v. Hobbs*, 132 S.Ct. 548 (2012), *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010) and *Roper v. Simmons*, 543 U.S. 551 (2005).

19. Mr. Shields was a developmentally disabled child who always had to have Individual Education Plans in public school, and had to drop out of High School and obtain his GED because of academic difficulties. Then, Shields was hit by a car while riding on his bicycle in 2001 and he suffered severe brain damage. The charges in the case at bar arose the summer after this accident when Shields was hired by a relative to babysit his younger cousins. While at his cousin's house, he was repeatedly given marijuana by his cousins' father. There was evidence that these young cousins were being physically abused by their father, but the young cousins made various allegations against Mr. Shields. Some of these allegations were rather fantastical allegations involving anal penetration and threats to kill the family dog and other (human) family members.

20. One of Mr. Shields' alleged victims has since recanted and confirmed that the allegations against Mr. Shields were all fabricated. However, in March 2006, the young, frightened, brain damaged Jonathan Shields pleaded guilty to one Fourth Class Felony Sex Assault against a Child and a Misdemeanor Sex offense in exchange for a deferred sentence. Upon information and belief, the District Attorney knew that the retaliation charges (involving the alleged threats to kill the dog and other family members) were all

fabricated, and dismissed these charges. The District Attorney took the unusual step of writing a written memorandum to the Judge outlining the terms of the deferred judgment and that it was fair to dismiss the retaliation charges. Unfortunately, the brain damaged Shields was unable to successfully complete the deferred judgment, it was revoked and he was resentenced to an indeterminate sentence of two years to life in the DOC on December 6, 2012.

21.    At the DOC, Mr. Shields was one of the few sex offenders, sentenced as an adult pursuant to the lifetime supervision act, who was able to successfully complete sex offender treatment prior to 2011, and Mr. Shields was paroled in early 2012. While in the DOC, Mr. Shields was given an "issue specific" polygraph allegations regarding the questionable allegations that he committed forcible sodomy and threatened to kill the alleged victim's dog and family members. He denied engaging in any anal sexual contact, threatening anyone with a firearm, forcible sexual contact or threatening his cousins that he would kill their dog or family members. He passed this polygraph examination with no deception. However, the Attorney General's Office and the Defendants continue to resurrect these false and fabricated allegations of threats with a firearm, forcible sodomy and threatening to kill dogs and family members. The Attorney General's Office and the Defendants take the inconsistent position that anytime a sex offender passes an "issue specific" polygraph examination that the results can be ignored as false negatives, but anytime a sex offender fails a sexual history or maintenance polygraph, that these results are conclusive proof of misconduct.

17

22.     When Mr. Shields was paroled in 2012, Defendant Jennifer Duncan was assigned to be his parole officer.  He was paroled to his mother's house, and moved into his little brother's bedroom.  Mr. Shields was cleaning the room up, removing trash and other former belongings of his brother.  In this room was a cell phone with a free month service as a promotion that his brother had been using.  Mr. Shields did improperly use this phone to text, but did not know that his brother had been using this phone to view websites that could be considered pornographic.  The text messages Mr. Shields sent revolved his efforts to obtain a job at his friend's mother's tow truck company.  His friend was an approved contact.  Mr. Shields' brother used that cell phone to take a "selfie" of himself and Mr. Shields when Mr. Shields was released from the DOC.  Duncan arrived at the Shields' house to search it shortly after Mr. Shields' arrival on parole.  She seized the phone, and noted that a friend of the family, who had shown up minutes prior to Duncan's arrival, had a felony record.  Mr. Shields did not know that this family friend had a felony record and had no control over who came to his mother's house.  Duncan arrested him in June 2012 and sought to revoke his parole over this telephone and unauthorized contact with another felon.  This was before Mr. Shields could even be enrolled into sex offender treatment in the community. Duncan argued to the Parole Board hearing officer that Mr. Shields had a poor attitude and did not care.  Duncan, like the other Defendants and the Attorney General's office, have been consistent in ignoring Mr. Shields' brain damage, which means that he is easily overwhelmed.  It is difficult for Mr. Shields to move efficiently through a "to do" list of tasks.  Mr. Shields knew he had to clean up his

brother's room, remove unauthorized items, and so forth, but he was not moving quickly enough for Ms. Duncan. The Parole Board hearing officer rejected Ms. Duncan's request to revoke his parole and remand him to the DOC and reinstated Mr. Shields' parole.

23. Mr. Shields entered sex offender treatment, and entered the community for the first time as an adult. He had been incarcerated from 2006 (when he was 20) until 2012. As a result, he had few life skills, and had to learn the basics such as how to manage his time, figure out public transportation and budget his money. His brain damage made learning those basic life skills more difficult. He was also exposed, for the first time, to the adult world of sexual attraction, flirtation and dating. He met a woman on the bus, who turned out to be a bit of a stalker, who became jealous and angry when he spurned her advances after an initial flirtation. This woman placed numerous "anonymous" phone calls to Duncan and other parole officers regarding Mr. Shields, and Duncan and her colleagues falsely claimed to the parole board that they were receiving "multiple" complaints regarding Mr. Shields as if multiple members of the community were making these allegations. Instead, it was just this one woman making the calls.

24. Mr. Shields struggled financially after he lost his job in 2013 and was no longer able to pay for sex offender treatment. Duncan ordered him to be placed in the Phoenix House Center. Phoenix Center took control over his finances, forced Mr. Shields to pay them first rather than the sex offender treatment provide, and he was no longer able to even call his lawyer, at 50 cents

19

per call.  His sex offender treatment provider terminated him from treatment, in large part, because he was unable to afford to pay for this treatment and the Mr. Shields was arrested and charged with technical parole violations a second time in early 2014.  In violation of CRS 17-2-103(5), it was months (many times longer than 10 days) before Mr. Shields was served with a parole revocation complaint. The Defendants failed to schedule the revocation hearing in compliance with CRS 17-2-103(7).

25.    Mr. Shields' second parole revocation hearing took place on March 10, 2014, presided over by Defendant Joe Morales.  At this hearing, all the false allegations that Mr. Shields forcibly sodomized his cousins, that he threatened to kill his cousins dog and other family members in order to cast Mr. Shields in a false light that he was "dangerous."  Morales revoked Mr. Shields' parole and sent him to the DOC for a 180 day turnaround.  Morales threatened Shields that if he was revoked a third time that he would be remanded to the DOC for the rest of his life without the possibility of parole.  Morales refused to acknowledge that Shields is a brain damaged juvenile offender, and that remanding him to the DOC for the rest of his life without the possibility of parole would be in express violation of *Miller v. Alabama,* 132 S.Ct. 2455 (2012), *Jackson v. Hobbs*, 132 S.Ct. 548 (2012) and *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010).  There is no Colorado statute that provides for judicial review of parole board action, and therefore there is no judicial review of a parole revocation proceeding. Consequently, if the parole board imprisons a juvenile offender, for life without possibility of parole, in violation of *Miller v. Alabama,* 132 S.Ct. 2455 (2012),

*Jackson v. Hobbs*, 132 S.Ct. 548 (2012) and *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010), there is no way for that juvenile offender to seek relief in the Colorado state courts.

26.    The female stalker who had been harassing Mr. Shields and placing the anonymous calls to his parole officer went to the Phoenix Center after March 10, 2014 and falsely represented herself as Mr. Shields' "girlfriend." Without checking her identification or her claim to be authorized to pick up Mr. Shields' possessions, Phoenix Center gave this woman Mr. Shields' jewelry (including a crucifix and chain), his watch, his wallet that contained his ID and Social Security Card and an ipod.

27.    Mr. Shields was released from the DOC on July 29, 2014.  He was dropped of at the Denver Reception and Diagnostic Center on Smith Road, without any clothes, money, identification or transportation and was expected to fend for himself and figure out how to get to Ms. Duncan's office.

28.    Ms. Duncan ordered Mr. Shields to live in the Carriage Inn, a dive motel, in an extremely dangerous neighborhood, on East Colfax in a room that was infested with bed bugs and other vermin.  This Carriage Inn is filled with other parolees who are sex offenders and many of them have been robbed, assaulted, had their faces smashed in, bones shattered and been victims of other violent crime because the area is so unsafe.   After living in this room for three weeks, Mr. Shields was covered in bed bug bites.  He had no clothes except for one pair of shorts, one pair of socks, no shirts and just one white undershirt/ tank top.  He had no money to buy food or clothes, and a pro bono attorney had to

21

bring him food and the small amount of cash that she was saving for him from his 2013 income tax refund.  Since the Phoenix Center recklessly allowed the stalker to steal his wallet, he had no ID when he was released on parole and cannot obtain a new one without an original birth certificate, which he does not have and he had no permission to go to the applicable state office to attempt to obtain a replacement.  The bed bug bites were clearly visible, and anyone with normal vision, such as Ms. Duncan, could clearly see the bed bug bites.  Additionally, Mr. Shields repeatedly told Ms. Duncan on or before August 9, 2014 about the problems with his room in the Carriage Inn motion (that it was infested with bed bugs, that the plumbing was broken so he had no hot water and could not shower because the tub would not drain and he would get his ankle monitor wet, that his sink was clogged, that he was not given clean linens, that he had no way to clean the bedbugs off of his clothes and lines, that he had no way to keep fresh food in his room because the refrigerator was broken and filthy and the room was filthy and had a nasty odor).   However, Ms. Duncan ignored these Eighth Amendment violations, told Mr. Shields that he was not allowed to go anywhere else to eat and had to buy food to eat in his room that he had to wash his clothes in the "sink" (despite the fact it was clogged and there was no hot water), and also told him that he was required to stay in the Carriage Inn because all Adams County parolees were required to reside at the Carriage Inn if they were paroled homeless.  Additionally, Ms. Duncan was on notice of the subpar conditions of the Carriage Inn because she supervised other Adams County parolees who were homeless and she ordered them to stay at the

22

Carriage Inn.  In particular, in Fall 2011, she ordered another homeless parolee, Dale Gross, to reside at the Carriage Inn, and knew that Dale Gross was assaulted after he complained to Mr. Kim that his slum motel had inadequate wiring and plugging in his hot plate caused the circuit breaker to trip.  Ms. Duncan knew that Mr. Kim's solution to the hot plate problem was to steal Mr. Gross's hotplate, and Ms. Duncan knew that Mr. Gross had to be transported from the Carriage Inn in an ambulance after he was assaulted.

29.     Ms. Duncan left a message for Mr. Shields on August 9, 2014 and told him that he could not have contact with any other person, including his parents.  His father was going to come over and help him try to get rid of the bed bugs, but now he is not even allowed to speak to his parents on the telephone. Duncan instructed Mr. Shields that he could not go anywhere except the parole office, his sex offender treatment office, the place where he does urinalysis and the office where his ankle monitor was installed.  He was not allowed to go anywhere to buy food, personal hygiene products, including Walmart and the Gas Station.  He was previously allowed to go grocery shopping twice a week. He was not allowed to work or search for work.  He was not allowed to go to a Laundromat to wash his clothes.  Duncan instructed him to wash out his clothes in his sink, but there is substandard plumbing in the dive motel and Mr. Shields' sink in his room was plugged up.  In any event, without soap, or the ability to go buy any soap, Mr. Shields could not rinse out his clothes in his room.

30.     Ms. Duncan's and the parole board's position is that the SOMB standards require that these restrictions be placed on Mr. Shields.  After Mr.

23

Shields filed the Complaint in this case on August 12, 2014 and filed a motion for a preliminary injunction on August 13, 2014. The Court set a hearing on the Motion for Preliminary Injunction several days later, and then Ms. Duncan dramatically changed her position. On or about August 21, 2014 Ms. Duncan removed the restriction that Mr. Shields could not see or talk to his parents. She gave him permission to make additional trips to the Grocery Store and to go visit his parents at their house. Mr. Shields went to his parents' house and was able to clean up with hot water and wash his clothes. On Monday August 24, 2014, Ms. Duncan had found other housing for Mr. Shields. However, Mr. Shields was subjected to the Eighth Amendment violations from the date of his parole until August 24, 2014 despite the fact that Ms. Duncan was on notice by August 9, 2014 that continued incarceration of Mr. Shields in the Carriage Inn was cruel and unusual because of the bedbug infestation, the broken plumbing, the inability to shower and stay clean, the inability to wash or clean his clothes or bed lines, the inability to keep any fresh food in his room which meant that he had to subsist on a diet of packaged junk food, and the nasty smelly filthy condition of the room.

31. On or about August 19, 2014, Mr. Kim, the owner of the Carriage Inn gave Mr. Shields clean linens for the first time since his incarceration at the Carriage Inn on July 29. The owner also gave him a large bottle of bedbug spray. While bug spray cannot reverse a bedbug infestation, in this case, it kept the vermin away from Mr. Shields while he is sleeping; and he only one or two new bedbug bites from August 19-24, 2014. Ms. Duncan still refused to come to

24

the Carriage Inn because of the bedbug infestation, and the treatment provider refused to allow Mr. Shields to attend any treatment so long as he was infested with bedbugs.

### Steven and Misty Christiansen and their daughter S.C.

32.    Steven and Misty Christiansen are married.  Mr. Christiansen was born in 1976, and his wife Misty was born in 1986.  Their infant daughter, S. C. was born in 2013.  Mr. Christiansen was not been allowed to see her or even talk about her to his wife since he was paroled on May 19, 2014 until he was discharged from parole in April 2015.

33.    In Adams County District Court case 2002CR715, Steven Christiansen was charged with various sex offenses for an event that allegedly occurred in May 1998 (prior to the effective date of the Lifetime Supervision Act). On June 8, 2004, Mr. Christiansen was sentenced to a single count of F4 Sex Assault on a Child, pursuant to an *Alford* Plea.  He was also sentenced concurrently in Adams County District Court case 2004CR33, for non sex offenses arising out of allegedly stealing a car, driving while intoxicated, driving under restraint and leaving the scene of an accident.  Mr. Christiansen was discharged from the DOC and successfully completed his mandatory parole.  He then met and married Misty and got on with his life.

34.    The only restriction placed on Mr. Christiansen after his discharge from parole was to continue to register as a sex offender.  He has been accused several times of failing to do so, and on December 3, 2013 (about 10 weeks after the birth of his daughter), he was sentenced to nine months DOC after pleading

25

guilty to failing to register in Adams County District Court case number 2013CR1049.   There is no allegation whatsoever that Mr. Christiansen ever committed an offense or was sexually inappropriate against his daughter, any other family member or anyone else since the 1998 allegations.   Pursuant to the definition of "sex offense" in CRS 16-11.7-102(3), failure to register is not considered a "sex offense."   However, pursuant to the SOMB Guidelines and CRS 16-11.7-102(1) and (2)(a) since Mr. Christiansen was convicted of a sex offense listed in CRS 16-11.7-102(3) pursuant to a prior conviction, he can still be designated as a "sex offender" and subject to the SOMB Guidelines for the treatment and monitoring of sex offenders while he was on parole.   Therefore, upon his parole, Mr. Christiansen was subjected to the one sized fits all SOMB Guidelines which provide that no sex offender may have contact with any person under the age of 18, even their own children.   Ms. Dawes directed that Mr. Christiansen was prohibited from living in his own home with his wife and daughter, and therefore Mr. Christiansen was paroled as homeless.

35.   Misty Christensen was born on August 18, 1986 and was the middle daughter to two drug addicts.   Her father abandoned the family when Misty was too young to remember, and the only time she saw him was when he was in his coffin in 2013.   She was first abandoned by her mother when she was three and was placed in a Children's Hospital psychiatric ward because she was so traumatized by the abuse that was inflicted by her mother and her mother's boyfriends.   At three years old, she would just sit in a corner and scream "hit me" "hit me" "hit me".   Her mother would periodically regain custody and then

abandoned Misty for good in 1998 when Misty was twelve. Misty was placed in the Colorado Christian Home Tennyson Center, and her little sister was adopted. Her older sister has such severe emotional and psychiatric problems that Misty has been unable to maintain contact with her. Misty was released from the Tennyson Center and then was placed in the Excelsior Youth Center where she allegedly assaulted a staff member. She was then sentenced to the Platte Valley Youth Correctional Center, and was charged with assault again after she threw her rubber flip flops down the hallway and one of them bounced against a staff member's foot. She was sentenced to four years in the DOC on July 27, 2005 in Weld Count Case 2005CR477 for assault on a peace officer while in custody; and therefore went to the DOC as an 18 year old. She was released homeless, and ended up in Arapahoe County. She was charged in Arapahoe County case 2011CR1918 with conspiracy to distribute a controlled substance after her friends were arrested and alleged text messages on her cell phone tied her to the conspiracy. She entered into an agreement for a four year deferred judgment and sentence on March 30, 2012. She has been clean and sober while on probation for the last three years, and has the clean urinalysis tests and hair follicle tests to prove it.

36. While Misty was on probation, she met married Mr. Christensen and was pregnant with S.C. in early 2013. Mr. Christensen was struggling with homelessness himself, which is why he picked up several failure to register charges after he successfully discharged his sentence and mandatory parole in the sex offender case, Adams County District Court case 2002CR715. Steven

27

was arrested for the 2013CR1049 Adams County failure to register charge while Misty was pregnant, but posted bond on May 8, 2013. He pleaded guilty on September 17, 2013 but did not appear at his October 11, 2013 sentencing hearing because he was at the hospital with Misty who was in labor. He was arrested four days later and was sentenced to nine months in the DOC on December 3, 2012.

37.     However, Adams County DHS swooped in and accused Misty of neglect and abuse of her infant daughter because she permitted her daughter to be with her father during the four days between her daughter's birth and Steven's arrest.   The *only* factual allegation was that Misty created an "unsafe" environment for the baby because Steven was a registered sex offender.  There was *no* allegation that Steven acted inappropriately toward his infant daughter, engaged in any sexual misconduct or any child abuse whatsoever.  The Adams County DHS case worker also made false allegations that Misty was a drug addict and because she was on probation, that she per se was an unfit parent. Both of these allegations had to be dropped because Misty was performing in an exemplary manner while on probation, and her hair follicle test proved that she was clean and sober for years before she became pregnant.  The Adams County DHS case worker who made these false allegations was Amanda Jurden on or about November 25, 2013.  When Mr. Christensen was paroled in Fall 2014, another Adams County DHS case worker, Chad Herrera, barged into Misty Christensen's life and again threatened to take away her daughter for abuse and neglect if she allowed Mr. Christensen to parole to her home where she was

28

living with her Aunt.  Misty Christensen is a strikingly beautiful woman and Mr.
Herrera condescendingly told her that she could do "much better" than Mr.
Christensen and that she needed to dump him and find a new father for her
daughter otherwise the government was going to take the baby away and place
her in foster care.  Misty was been terrified ever since, and is afraid to allow Mr.
Christensen to see his daughter because of the unconstitutional threats made by
Adams County DHS.  She did go to see Mr. Christensen at the first dive motel on
East Colfax where he was incarcerated when he was first paroled, but she left
the baby with her Aunt.  She became pregnant again, but miscarried the baby
after the owner of this dive motel punched her in the stomach over a TV she was
trying to bring to her husband and the Motel owner was trying to steal from Misty.
(Just like the owner of the Carriage Inn tried to steal Mr. Gross's hotplate.  The
owners of these dive motels on Colfax Ave., where the DOC division of adult
parole incarcerates the homeless parolees, preys upon these indigent and
helpless men because they know they can get away with it.  They force them to
clean the motel and do the motel laundry, without compensation, so that the
motels do not have to pay employees to clean the motel and do the laundry, and
they come in and out of the parolees' rooms and steal their belongings.  If the
parolees or family members complain, they are assaulted.)

38.    The Directors of Adams County and Arapahoe County DHS
(Defendants Chris Kline and Cheryl Ternes) respectively, have unwritten but
unconstitutional policies of charging any parent with abuse and neglect if the
parent permits any child to have any contact with any registered sex offender,

29

even if the sex offender is the child's own father or grandfather. Pursuant to Kline's and Ternes' unconstitutional policy, the sex offender parent or grandparent must be given a psychosexual evaluation and a parental risk assessment and then engage in offense specific treatment if recommended by the psychosexual evaluation. However, the recommendation for treatment is not tied to whether there is any actual evidence that in the years since the sex offense was committed that the offender has committed new sexual offenses, displayed a propensity to commit future sexual offenses, exhibited a proclivity toward sexual violence, has continuing deviant sexual tendencies, fantasizes about having sex with children, or has otherwise displayed a danger to his own children and grandchildren. Instead, the recommendations of the psychosexual evaluation and parental risk assessment are based on how the offender does on the Abel Assessment of Sexual Interest and other tests dependent upon a penile plethysmography. The penile plethysmography is junk science, and it is unconstitutional to require a sex offender to submit to such a test as a term and condition of probation, parole or supervised release. See *United States v. McLaurin,* 731 F.3d 258 (2nd Cir. 2013). Therefore, it would be even more egregious to prevent an offender from exercising his constitutional right to parent his own children based on this junk science. The known or potential error rate of the Abel Assessment of Sexual Interest varies from poor (Gray's calculation of general 21-22% error rate and Dr. Abel's calculation of 32% error rate) to appalling (64% error rate in Dr. Gray's analysis of' a group of dissimulators). Not only is the theory underlying the test unproven, its error rate makes it a highly

unreliable instrument as a measurement of pedophilia in the criminal justice context. See, *United States v. Birdsbill*, 243 F. Supp. 2d 1128, 1135-1136 (D. Mont. 2003).

39.   Yet it is these unreliable junk science tests that Defendants Chris Kline and Cheryl Ternes demand that Plaintiffs Steve Christiansen and Harold Groves take and "pass" in order to "prove" that they can safely parent their children and grandchildren. This unconstitutionally shifts the burden of proof onto the sex offender who has completed his sentence, discharged his debt to society and has done nothing new whatsoever to justify any suspicion that he "might" engage in a sexual offense in the future. Instead, the burden of proof is upon the government to come forward with *compelling evidence* that in the decades since Mr. Christiansen and Mr. Groves committed their underlying sex offense, that they have committed new sexual offenses, displayed a propensity to commit future sexual offenses, exhibited a proclivity toward sexual violence, has continuing deviant sexual tendencies, fantasizes about having sex with children, or has otherwise displayed a danger to his own children and grandchildren. *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. October 31, 2014).

40.   Pursuant to this unconstitutional policy by Adams County DHS, the "Initial Assessment Plan," forced upon Misty Christiansen, as a term and condition of not having her infant daughter unconstitutionally snatched from her care, demanded that she agree that the father of her child may not have any contact with S.C. unless he undertook a new psychosexual evaluation and a parental risk assessment and go back into offense specific treatment -- despite

31

that fact that there has been no new allegation of sexual misconduct whatsoever in the decades since his offense. That unconstitutionally deprived the Christiansens from parenting their infant daughter.

41. In addition, for no reason other than Steven Christensen has a decades old sex offense, and because Misty Christensen allowed the father of her baby to be present at her baby's birth and then to parent her, "red flags" were entered in the statewide TRAILS system by Adams County DHS. These "red flags" have serious adverse consequences and will prevent the Christiansens from obtaining certain jobs, from opening up certain types of businesses, or from adopting children or from ever gaining custody of their grandchildren (in the future if something happened to S.C. after she was grown up and had children of her own). The Adams County DHS Case Worker responsible for the "red flags" was Rick Schilling, and his actions were unconstitutional because they were based on the unconstitutional premise that a sex offender is a per se danger to his own children. Rick Schilling had no evidence, much less compelling evidence, that since S.C.'s birth, Mr. Christensen committed new sexual offenses, displayed a propensity to commit future sexual offenses, exhibited a proclivity toward sexual violence, has continuing deviant sexual tendencies, fantasizes about having sex with children, or has otherwise displayed a danger to S.C. *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. October 31, 2014). These "red flags" became permanent in the TRAILS system on or about January 8, 2015 (after the law was clearly established in the Tenth Circuit). The Records Custodian responsible for the entry of these permanent "red flags" in the TRAILS

system is Defendant Caire Krol, the Supervisor for the Adams County DHS "Child Abuse Records & Appeals Program."

42.    Ms. Dawes ordered Mr. Christiansen to live in the Motel 9, from September 9 - October 7 2014, another dive motel in an extremely dangerous neighborhood on East Colfax in a room that is infested with rodents and other vermin.  This dive motel is filled with other parolees who are sex offenders and many of them have been robbed, assaulted, had their faces smashed in, bones shattered and been victims of other violent crime because the area is so unsafe. Mr. Christensen is indigent and homeless, unable to live with or even talk with his wife.  He has very limited money for food.  At Motel 9, what food he did have would be contaminated by the mice or rats that live in the motel.  His Ramen noodles would be ripped open and partially eaten.  He could not afford to have to throw away this food, and he often went hungry.  He was ordered to stay in his room and not leave without the permission of Ms. Dawes.  He ran out of his bipolar medication, such as lithium and welbutran.  Ms. Dawes refused to give him permission to have his medications refilled and told him that he was using mental illness as an "excuse."  Mr. Christiansen repeatedly informed Ms. Dawes that there were rodent feces in his boxspring mattress which the Motel 9 refused to clean up or give him a mattress that was not infested with vermin.  The heat did not work.  The bathroom did not have operational plumbing and Mr. Christiansen was forced to use another inmate's bathroom down the hall.  Motel 9 refused to supply him with a topsheet, and all he was given was a filthy bottom sheet (with no way to wash it) to cover over the vermin and feces infested

33

mattress.  However, Ms. Dawes ignored his complaints.  The window was broken and taped over.  Most mornings, Mr. Christiansen was able to take pictures of dead mice in his room with his cell phone.  Motel 9 management refused to clean up the rodents or call an exterminator.  Every time Mr. Christiansen tried to complain to the Motel 9 manager, he was threatened with being tattled on to his parole officer for some non existent infraction.  Mr. Christiansen did not commit any offense or parole violation while forced to live at Motel 9; instead, the Motel 9 management was extorting his silence by threatening to make false complaints to his parole officer.

43.     On or about October 7, 2014, Ms. Dawes informed Mr. Christiansen that he would have to start paying $245 a week for the motel room at Motel 9 or face revocation and go back to the DOC.  He cannot afford to pay that fee plus the cost of housing for his wife and daughter.  On October 13, 2014 Mr. Christiansen was allowed to move in with other family members in Commerce City but not his wife.  Therefore, he endured five months of imprisonment in the vermin infested Motel 9.  On October 22, 2014 Misty Christiansen and the baby had to move into a homeless shelter in Aurora.  If they were allowed to live with Mr. Christiansen in Commerce City, they would not have been homeless.

44.     Because Mr. Christiansen was designated as a "sex offender" because of his prior sex offender conviction, his parole officer and the parole board prohibited him from having any verbal or physical contact with his daughter, and he was not even allowed to have a picture of his daughter.  However, Mr. Christansen kept a picture of his daughter in his backpack, which

34

Ms. Dawes found and alleged that he was in violation of his parole. Upon information and belief, Ms. Dawes' and the parole board's position is that the SOMB standards require that she place these restrictions on Mr. Christiansen.

45. Despite all of these obstacles, Mr. Christiansen successfully discharged his parole in April 2015 and is completely off paper. However, he is homeless and had to parole homeless because of the unconstitutional Adams County DHS policy that S.C. will be removed from Misty's case if she permits her husband and father of her child to have any contact with S.C. All this young family wants is to be reunited so that they may live together.

### Harold Dean Groves, Marsha Groves and Melissa Hessler

46. Mr. Groves was convicted on June 24, 1994 of F4 Sexual Assault in the second degree and was sentenced to two years in the DOC plus five years of mandatory parole. Denver County District Court case 1994CR1931. He had a prior 3d class misdemeanor conviction in Denver Case 1987CR1712 and received a suspended sentence. Denver County District Court case 1994CR1931 is Mr. Groves' only felony conviction.

47. Mr. Groves was paroled in 1995, and was required to engage in offense specific treatment in the community as a term and condition of parole. His treatment provider is no longer in business and his treatment records no longer exist. He successfully completed parole and was discharged from his sentence on September 29, 1999.

35

48.     Mr. Groves has not been accused of any sex offense or sexually inappropriate conduct against any child or against any adult other than the victim in Denver County District Court case 1994CR1931.

49.     Mr. Groves married Marsha Groves and together they raised Marsha's two daughters and had their own son, who is currently sixteen years old.  Marsha's daughter Melissa Hessler is the mother of the two boys at issue. Mr. Groves has never been accused of child abuse, child neglect or any inappropriate or criminal action toward Melissa's two children.  These two children have lived with Mr. and Mrs. Groves for the last three years, since just after the younger one's birth and the Groves have been the primary parental figures for these two children.  Mr. Groves has been the primary male father figure in the younger boy's life.  The boys' biological fathers have effectively abandoned them and have not supported them either financially or emotionally.

50.     Since his discharge from parole, Mr. Groves has been convicted of three traffic offenses (for expired plates, failure to show proof of insurance and for careless driving in 1986.  There was no alcohol involved in any of these offenses.

51.     In addition to the traffic offenses, Mr. Groves took an *Alford* plea to third degree assault on September 19, 2012 in Arapahoe County case 2012M3369 and entered into a deferred judgment and sentence agreement with the prosecution.  The victim was his step-daughter Melissa.  There was no serious injuries, and no allegation of any sexual offense in this case.  The incident happened because they were arguing over Melissa's care of the boys,

and the argument escalated into a shoving match. However, because Mr. Groves had a prior sex offense conviction, Arapahoe County Court Judge Rowles-Stokes required Mr. Groves to undergo a Psychosexual Evaluation, which was accomplished by LM & Associates Inc. on October 24, 2012. This was required by Colorado statute, and the Judge had no discretion to not order the evaluation; however, she had the discretion to decide what weight (if any) to give to the recommendations in the evaluation. The evaluator recommended that Mr. Groves reaccomplish offense specific treatment. However, Judge Rowles-Stokes rejected that recommendation on December 16, 2013. Mr. Groves successfully completed the DJS, and his guilty plea was withdrawn on January 16, 2015 and the charge was dismissed.

52. In December 2014, Melissa was caught driving the two boys without a car seat and was reported to Arapahoe County DHS. A Dependency and Neglect case was opened up in Arapahoe County District Court. Defendant Kelly Holtz was assigned as the Arapahoe County DHS case worker, and Alison Bettenberg was appointed as the Court appointed GAL. She then delegated this task to her associate Sarah Yarbrough. The children were removed from the care of the Groves because Mr. Groves is a registered sex offender and because he had undergone the psychosexual evaluation in 2012. The boys were placed with Tammy Bruntz, Melissa's paternal aunt. Ms. Bruntz has been very supportive of the Groves, but she did not have a prior relationship with the boys. The oldest boy in particular did not know her, was frightened to leave home and reacted very badly to being ripped from his grandparents' home. On or about

April 9, 2015, he threatened to commit suicide and remains hospitalized in Children's Hospital.

53.    As of March 17, 2015, there were no "no contact" orders prohibiting contact between the Groves and the children.  However, the case worker and GAL have acted in the opposite way.  They take the position, based on Cheryl Ternes unconstitutional policy (described above) that Harold Groves may have no contact with the boys until he reaccomplishes offense specific treatment for the 1994 sex offense conviction.  Even if he were willing to acquiesce to the Department's unconstitutional policy for the sake of his grandsons, he cannot do so because of his seventeen year old son.  If he were to enroll in offense specific treatment, then pursuant to the SOMB unconstitutional policy that is at issue in this lawsuit, he would not be permitted to live at home with his son or have any contact with his son -- or even be able to talk to Marsha about his son.

54.    The case worker and GAL are fabricating reasons or pretexts why Mr. Groves is a threat to the safety of his grandsons.  For example, they use as an excuse that in December 2014, Mr. Groves picked up his oldest grandson from school (nothing happened, there were no allegations he engaged in any criminal or sexual behavior), that he did not know what was his alleged "cycle" from offense specific treatment twenty years ago (the treatment that was provided sex offenders in the 1990s did not necessarily involve any discussion of a "cycle"), that the Groves did not disclose the 2012 psychosexual evaluation until they had the chance to consult with counsel, that they did not "hear" the oldest boy's school's concerns regarding whether he should be in therapy (since

38

the Groves were not the legal guardians of either of the two boys, they cannot make medical decisions for them) or that the Groves did not go along with the school's recommendation that they excessively medicate the older boy on Ritalin over Melissa Hessler's objections.  Again, the Arapahoe County DHS is engaging in the same unconstitutional shifting of the burden of proof as the Adams County DHS and demanding that Mr. Groves disprove every conceivable possible allegation of hypothetical sexual misconduct or grooming behavior (no matter how far fetched).  The county attorney representing the case worker has even alleged that Mr. Groves "might" engage in "grooming behavior" by waggling his pinky finger at the boys.  This county attorney can allege no actual facts in support that Mr. Groves has engaged in any actual grooming behavior whatsoever, much less any type of sexual misconduct in the decades since his sex offense conviction.  Just as in Adams County with respect to the Christiansen family, the Arapahoe County DHS has no evidence, much less compelling evidence, that Harold Dean Groves committed new sexual offenses, displayed a propensity to commit future sexual offenses, exhibited a proclivity toward sexual violence, has continuing deviant sexual tendencies, fantasizes about having sex with children, or has otherwise displayed a danger to his grandsons.  *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. October 31, 2014).

55.    The case worker and GAL (Defendants Kelly Holtz, Alison Bettenberg and Sarah Yarbrough) have been given the discretion to permit Mr. and Mrs. Groves to have visitation with their grandchildren.  Acting under color of this state law authority delegated to them by the Arapahoe County District Court,

these three Defendants have denied the Groves their right to familial association unless Mr. Groves goes back into sex offender treatment, have prohibited even Marsha Groves from visiting her grandson at Children's Hospital and have even gone to the length of ordering Mr. Groves from not going to any public place where his grandsons could be.   If Mr. Groves has to go back into sex offender treatment, then he will be required to have no contact with his own teenaged son pursuant to the unconstitutional SOMB policy that is the gravamen of the case at bar.  On April 15, 2015, the GAL and the Arapahoe County Attorney representing the Case Worker requested an Order from the state court that the Groves and undersigned counsel be held in contempt for initiating this lawsuit against them, and requested an order that Melissa Hessler be stripped of all parental decision making authority for communicating to her parents regarding this lawsuit and telling her parents about her oldest son's suicide attempt.  The state court judge (Defendant Lung) ordered that if any party or attorney to the dependency and neglect case discloses any pleading or the contents of any pleading in the case at bar, then he or she will be jailed for six months.  This will prevent the litigants in the case at bar from complying with FRCP Rules 26(a)(1)(A), 33 or 34 without the threat that the state court judge will unconstitutionally hold them in contempt for complying with the federal rules of civil procedure.

**James Kerns**

56.    James Kerns was born on April 30, 1975.  His daughter was born shortly after his nineteenth birthday in July 1994.  When his daughter was three, Mr. Kerns was charged in Virginia with taking indecent liberties with a child.

These allegations were made by his ex-wife and her new husband after the new husband announced to other family members that he "would do whatever it took" to insure that the Kerns family never saw the children again.  Mr. Kerns was young and frightened and made the decision to enter in to a plea agreement.  He served five years in prison, and while he was in prison, the Virginia sex offender registration statute was retroactively changed to require lifetime registration.  Therefore, when Mr. Kerns moved to Colorado in 2009, he was a registered sex offender.  Mr. Kerns has not been accused of any other sexual improprieties or sex offenses since 1997.  However, he was convicted of other crimes in Colorado.  On July 14, 2013 he was convicted of felony menacing as a result of a domestic dispute with his estranged wife in Jefferson County case number 2013CR2391 and the mandatory protection order entered.  In Jefferson County case numbers 2013M3236, 2013M5305 and 2013M5751 Mr. Kerns was charged with violating that protective order.  He was sentenced to one year DOC plus one year mandatory parole on December 2, 2013 for felony menacing.  However, because of the 17 year old sex offender conviction in Virginia, the DOC designated Mr. Kerns as a "sex offender."

57.    When Mr. Kerns was sentenced in December 2013, his now adult daughter moved to Colorado to build a relationship with her father.  She does not feel that she is a victim, and wants to have contact with her father.

58.    On or about May 7, 2014, Mr. Kerns was released from the DOC onto parole.  A term and condition of his parole was that he was to have no contact with his "victim," who is his estranged wife.  His adult daughter is not a

41

"victim" of any crime he was convicted of in Colorado. He discharged his Virginia sentence over ten years ago. His brother and daughter picked him up from where he was released and took him to his parole officer, Amy Tate. Ms. Tate immediately arrested Mr. Kerns for parole violations for having contact with his adult daughter. Mr. Kerns was sent to Park County jail until his parole revocation hearing on or about June 26, 2014. The parole board sentenced him to five months in a halfway house, to have no contact with his adult daughter until he completes sex offender treatment and to not have contact with any minor under any circumstance.

59.    Other residents of the halfway house found out that Mr. Kerns is a registered sex offender and have threatened him repeatedly with physical harm. The parole board and the DOC have failed to keep him safe from the assaults of other inmates, and have increased his exposure to risk of assault by labeling him as a "sex offender" even though he has to sex offense conviction in Colorado and is not serving any sentence for a sex offense.

60.    Mr. Kerns was released on mandatory parole on November 24, 2014. Ms. Tate and the parole board would not let him parole to his mother's house in Aurora Colorado because his mother lives with one of her grandchildren, who is a minor. Therefore, Mr. Kerns was homeless for the entire time he was on parole for no rational reason. Mr. Kerns was unconditionally discharged from his sentence on February 12, 2015. The law was clearly established by *United States v. Bear*, 769 F.3d 1221 (10th Cir. October 31, 2014) in the Tenth Circuit by November 24, 2014 that a sex offender cannot be barred

42

from having contact with his minor family members simply because of a decades old sex offense.  Ms. Tate has no evidence, much less compelling evidence that in the decades since he committed the sex offense in Virginia, that Mr. Kerns committed new sexual offenses, displayed a propensity to commit future sexual offenses, exhibited a proclivity toward sexual violence, has continuing deviant sexual tendencies, fantasizes about having sex with children, or has otherwise displayed a danger to his grandsons.  *United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. October 31, 2014).

**Eric Petersen**

61.    Eric Petersen was born on October 13, 1977.  He was convicted of sex assault on a child and sentenced to two years to life in the DOC on April 21, 2003.   The offense took place on October 21, 1999 (one week after Mr. Petersen's 22 birthday) when he kissed and fondled the breast of his roommate's 14 year old babysitter. He volunteer to drive home the babysitter after his roommate and his wife came home inebriated.  He was convicted in Arapahoe Count case number 2000CR32, and was originally sentenced to a deferred sentence of four years probation for Sexual Assault On A Child and 12 years Probation for 2nd Degree Kidnapping.  Both sentences were concurrent.

61.    While on probation, Mr. Petersen met Jenny Salzman in February 2002 and moved in with her in Spring of 2002.  In August 2002, Mr. Petersen was arrested and lost his deferred judgment for for being in denial in regards to offense of record, and entering into a relationship with Jenny Salzman who had a minor child at that time.  However, by this time, Ms. Salzman was pregnant with

43

Mr. Petersen's daughter L.P.  On April 21, 2003, Mr. Petersen was resentenced to two years to life in the DOC.  He daughter was born on May 31, 2003 while he was in prison and he has never even been allowed to meet her, much less parent her or even talk to her.

63.    While incarcerated at the DOC, Mr. Petersen completed SOTMP (sex offender) treatment, and participated in treatment for a total of four years of the seven years while incarcerated.  However, he had problems passing the required polygraph examinations required by the SOMB and was terminated from treatment in the DOC as a result.  He filed a federal lawsuit, Petersen v. Dunlap, 08-cv-00668-ZLW-KMT to address the constitutionality of being terminated specifically from treatment because of failed polygraphs, along with other claims. The case became moot when Mr. Petersen was paroled on July 1, 2010 and was enrolled in sex offender treatment in the community.

64.    When Mr. Petersen was paroled, he was allowed to have four pictures of his daughter, which he still has.  This is the only "contact" with his daughter that the parole board and his parole officer have ever permitted.  L.P. has Asperger's syndrome and it has been very difficult for Ms. Salzman to raise L.P. as a single parent; she is in favor of Mr. Petersen being able to participate in L.P.'s life and share in the parenting duties.  All Mr. Petersen can do to support Ms. Salzman and L.P. is to pay child support, which he has done ever since he was paroled.

65.    Mr. Petersen has two sisters and six nieces and nephews.  He is prohibited all contact with his nieces and nephews as a result of directives from

the parole board and his parole officer.   His sisters and brothers in law want him to have a normal family relationship with his nieces and nephews.

66.    Mr. Peterson was administered the Infinity Arousal Assessment on or about March 31, 2014, and the results determined that he does not have deviant arousal to children, only to age appropriate adult women.

67.    Mr. Petersen has been gainfully employed by Paladin Commercial Group since July 12, 2010, and has been highly successful.  His boss/CEO, Dan Duncan, has known Mr. Petersen since prior to 1999 and has been very supportive of Mr. Petersen.  However, as per the terms and conditions of his parole, Mr. Petersen is not allowed to socialize with Mr. Duncan's family because Mr. Duncan has a minor son.

68.    On or about October 21, 2014, Mr. Petersen was diagnosed with Heart Palpitations, as well as a strain to the cervical joints in his neck.  Mr. Petersen experiences pain due to his injured neck and back and has been prescribed medications as a result.

69.    Mr. Petersen continues to have difficulty passing polygraph examinations.  He has failed twelve polygraphs while on parole, and the only polygraph examination he ever passed was an issue specific polygraph examination he took when he returned from Idaho for his grandmother's funeral. He was asked whether he had any contact with minors while on this furlough, and the polygraph test results were non deceptive.  In the twelve polygraph examinations he has failed, the polygrapher alleges that he produced deceptive results when asked whether he has had contact with his daughter, or has had

45

sexual contact with minors. He has engaged in neither behavior since his incarceration in 2003 and has never met his daughter or spoken to her on the telephone.

70.    The SOMB has promulgated a rigid policy that offenders who fail polygraph examinations MUST be placed on increased containment. Polygraph examinations are inherently unreliable and are inadmissible in court for the truth of the matter asserted -- the deceptive polygraph cannot be used as "evidence" that Mr. Petersen has had unauthorized contact with his daughter or engaged in sexual contact with minors. However, this is exactly what the SOMB policies dictate.    If there is a deceptive polygraph, then the offender must make "disclosures" and then pass the polygraph examination or suffer "consequences." The "consequences" are deprivation of liberty for no other reason that the deceptive polygraphs. Mr. Petersen has had to submit to and pay for "tracking." He has a GPS bracelet and is constantly monitored and stalked by the tracker. He has never been in an unauthorized location or observed by the tracked to have any unauthorized contact. Therefore, it is clear that the truth is that Mr. Petersen has not engaged in any unauthorized behavior, and the unreliable polygraph examination is the problem, not Mr. Petersen. However, the SOMB stubbornly refuses to acknowledge that the polygraph examinations are inherently unreliable and treat the polygraph results as undeniable evidence of behavior. On or about October 15, 2014 Ms. Phillips determined that Mr. Petersen would have to be placed in community corrections and have his liberty restricted if he continued to fail these polygraph examinations. Upon information

46

and belief, Ms. Phillips believes that the SOMB guidelines require increasing restriction of liberty when the offender fails polygraph examinations.

### Wesley and Jessica Specht

71.    Wesley Specht was born on September 21, 1984.  He had a job as a contract coach at a Jefferson County high school in 2010.  In Jefferson County case number 2011CR965, he was charged with sex assault on a child by one in a position of trust and other related offenses for allegedly having sexual contact with three teenaged girls at the high school.  The jury acquitted him of two of the three counts of sexual assault on a child by one in a position of trust, and sexual assault on a child less than 15 years of age.  He was convicted of one count of sexual assault on a child by one in a position of trust of the victim who was seventeen years old at the time and always claimed that the relationship was consensual.  On July 13, 2012 he was sentenced to 12 years to life in the DOC. It is not a crime in Colorado for an adult of any age to have consensual sexual intercourse with a seventeen year old -- unless the adult is in a "position of trust," and then it is presumed that the victim is incapable of consent, and the defendant is unable to rebut the presumption.  The constitutionality of this presumption is one of the issues in Mr. Specht's case.  His conviction is currently on direct appeal.

72.    Mr. Specht's "victim" is now his wife, Jessica Specht.  On July 13, 2012, the date Mr. Specht was sentenced, the Jefferson County District Court vacated the protection order prohibiting contact between Mr. Specht and Jessica. She went to visit him twice in the county jail before he was transferred to the

DOC. They were married on March 27, 2013 when she was nineteen years old. Mr. Specht just turned 30 years old. Colorado allows marriage by proxy, and therefore the parties to a marriage do not need to be in the same room in order to become legally married.

73.     Mr. Specht's sister Megan Lee Boozer is two years older than Mr. Specht and is the mother of Mr. Specht's niece and nephew born in 2005 and 2013. Jessica and Zachary Zanghi are long time friends of Mr. Specht. They are the parents of two children born in 1998 and 2003, and these children grew up knowing Mr. Specht.

74.     The Colorado DOC has denied Mr. Specht all visitation with his wife and any other person under the age of eighteen including Mr. Specht's niece and nephew and the Zanghi children. Mr. Specht and his family and Ms. Zanghi filed grievances and other inquiries regarding the denial of visitation. Mr. Specht is incarcerated at Crowley County Correctional Facility, and the Warden of that facility at all material times was Warden Miller, and the Mental Health Director was Don Plagge. Mr. Specht's application for visitation with his wife, other family members and the Zanghi children was submitted to Dan Plagge in October 2013. Mr. Plagge submitted the application to the DOC visitation committee, but his application was denied. On March 19 and 20 Jessica Zanghi personally talked to Warden Miller who told her that Mr. Specht would never be permitted to have visitation with his wife or anyone under the age of 18. Mr. Specht has exhausted all administrative remedies that are reasonably available, and given Warden Miller's directives any attempts to resolve this dispute administratively is futile.

75.     The DOC's denial of visitation between Mr. Specht and his wife and any child under the age of 18 is an implementation of the SOMB one sized fits all policy that sex offenders may never have any contact with anyone designated as a "victim" of a sexual assault by the offender or contact with anyone who is under the age of 18.

76.     The restrictions on Mr. Specht's visitation with his wife and other family members is not rationally related to any legitimate penological interest. The SOMB policy does not create a defacto legitimate penological interest.  Mr. Specht has never been accused of any other sexual impropriety or crime and has never been accused of harming any children other than the children in Jefferson County case number 2011CR965.

**Christopher and Ashley Clark**

77.     Mr. Clark was born on October 9, 1983, and was sentenced to six years DOC on July 10, 2012 in Mesa County District Court case number 2012CR389.  At the time, he was on parole from convictions in two other Mesa County felony cases:  2008CR850 and 2008CR914.  None of these cases were for sex offenses, and Mr. Clark has never been convicted of a sex offense or charged with a sex offense.  Ashley Clark has never been a "victim" of any of Mr. Clark's crimes or alleged crimes.  Mr. Clark is currently in the custody of the Department of Corrections in the Mesa County Community Corrections facility.

78.     Ashley Clark is Christopher Clark's wife, and for some reason Defendants Matthew Sullivan and Miranda Kinnett (who are officials of the Mesa County Community Corrections facility) disapprove of Mr. Clark's relationship

with Ashley. They have allowed Mr. Clark to have visitation with other women, even women with children, when they have denied Mr. Clark any contact with his wife. Ashley Clark has no criminal record and has not been accused of or charged with any crime.

79. Ashley and Christopher have known each other for years, and were in an on again off again relationship since they were teenagers. When Mr. Clark was sentenced to the DOC on July 10, 2012, Ashley was pregnant and their son was born seven days later on July 17, 2012.

80. Mr. Clark was released to the Mesa County Community Corrections facility on or about January 21, 2014 and the facility initially gave Mr. Clark passes every weekend on Saturday and Sunday so that he could spend time with Ashley and their son. Ashley and Christopher got married on or about February 21, 2014. When that happened, the Mesa County Community Corrections facility suddenly started treated Mr. Clark as if he were a sex offender, for no rational reason. He was given a write up for getting married without "permission," and then Matthew Sullivan and Miranda Kinnett refused to allow Mr. Clark to see Ashley at all. They instructed the Clarks that if they engaged in "marriage counseling" that they would get their passes back. There was no rational reason to require "marriage counseling," and it is none of Mr. Sullivan's and Ms. Kinnett's business that Ashley and Christopher made the decision to marry. They accused Mr. Clark of having affairs with other women and that he was not good enough to be in a relationship with Ashley. Mr. Clark is an African American and Mrs. Clark is Caucasian. The only contact Christopher

50

and Ashley had was during the marriage counseling at the Community Corrections facility and they graduated marriage counseling in May 2014; however, Mr. Sullivan and Ms. Kinnett continued to deny Mr. Clark having any contact with his wife. During this time period, Mr. Clark was given passes to have outside contact with his brother and other female friends, but Mr. Sullivan and Ms. Kinnett continued with their officious efforts to break up the Clarks' marriage by denying them all contact.

81. Both Ashley and Christopher Clark complained and submitted grievances to numerous individuals at the Mesa County Community Corrections facility regarding the restrictions on their contact, and they exhausted all available administrative remedies. On June 20, 2014 the Clarks were allowed to see each other again, and Ashley became pregnant with their second child on or about their son's second birthday on July 17, 2014. Mr. Clark has since been released on ISP (intensified supervision) but was not allowed to live with his wife and children for sixty days. Other inmates of the Mesa County Community Corrections facility are allowed to go straight home to their spouses when released from the facility on ISP. Therefore, the Clarks have to undergo the expense of maintaining two households for at least two months, for no rational reason.

82. The restrictions on Mr. Clark's visitation with his pregnant wife and son were not rationally related to any legitimate penological interest. There is no rational reason to treat him like a sex offender and restrict his access to his pregnant wife and minor son as if he were a sex offender. Even if he were a sex

offender, it was unconstitutional to restrict his visitation with his pregnant wife and toddler son.

**David Zayatz, Erin McClanahan and their daughter R.M.**

83.    David Zayatz was born on June 16, 1977.  He was a troubled teen growing up in Boulder County and picked up four juvenile adjudications in Boulder, Jefferson and Weld counties from 1989-1995.  On of them, Boulder County case 1995JD787 was for criminal mischief in Longmont on February 24, 1994 for allegedly "mooning" some people.  (Mooning is pulling down one's pants, and bending over to display the bare buttocks as a display of disrespect.)  Mr. Zayatz was sentenced to time served in the juvenile detention center and released.  He did  not have to undergo a psychosexual evaluation of sex offense specific treatment of any kind.  There was no allegation or concern that he was engaging in sexualized behavior by "mooning."   There was no allegation of indecent exposure or any other sex offense.

84.    Mr. Zayatz grew up to be an equally troubled young man and picked up four felony convictions in Boulder and Denver counties when he was 19 and 20.   None of these convictions were for sex offenses, but were for offenses such as burglary, criminal trespass and "escape" for walking away from community corrections.   He was sentenced to four years in the DOC on September 11, 1998.  He was parole eligible less than a year later, and when he was paroled in 1999 he absconded and disappeared.

85.    Mr. Zayatz remained under the radar for over 15 years and did not resurface until early 2015 when he was arrested on the outstanding parole

revocation warrant when he was pulled over for a traffic violation at his home in Lake Worth Florida.  In the intervening years, he had matured, settled down and was involved in a long term relationship with Erin McClanahan, his common law wife.  He had a job and he and Erin had purchased a home.  They have a ten year old daughter, R.M., and Erin is currently pregnant with their second child. Erin has always known about his past and accepted it.  He has always been a loving father to R.M. and there is zero evidence of any sexual or other abuse or misconduct.

86.     Mr. Zayatz was extradited to Colorado as a parole absconder and met the parole board on or about March 18, 2015.  His new parole officer, Matt Carey, was also present.  Mr. Carey is a community parole officer that specializes in supervising sex offenders.  Mr. Zayatz was returned to the DOC where he will either remain until July 29, 2017 or be reparoled.

87.     At the parole hearing, Mr. Zayatz was reminded by the hearing officer and Mr. Carey that he had been designated as an unadjudicated "sex offender" based on the 1994 mooning charge.  This means that he will be prohibited from having visitation at the DOC with his children, and will be prohibited from residing with Erin McClanahan if he is reparoled because he will be prohibited from living with minors.  This prohibition is based on the unconstitutional SOMB policy.

**Earl Cooley**

88.     Mr. Cooley was born on December 15, 1971.  In El Paso County case number 2004CR3053, he was convicted of sex assault on a child and was

53

sentenced to two years to life after his probation was revoked. His victim was his stepdaughter.

89. Mr. Cooley was paroled on June 24, 2014, and his parole officer is Michelle Sage. He still has one minor child, N.C., who was two years old when he was first charged with the offense on his 16 year old step daughter. Because of the unconstitutional SOMB policy, he has been prohibited from having any contact with her for almost a decade. He has taken all the parental risk assessments and has been found to pose no risk to his minor children and grandchildren. He also has two grandchildren, who were born while he was in prison, that he has never met. He is also prohibited from having any contact with them because of the unconstitutional DOC policy.

**Thomas Spitz**

90. Mr. Spitz was born on January 30, 1960. He was convicted of sex assault on a child in El Paso County Case number 2000CR3145 and was sentenced to two years to life on February 17, 2006 after a probation revocation hearing. After years of unsuccessfully trying to obtain sex offender treatment, he had to file a lawsuit in order to obtain that treatment. On June 1, 2011 the El Paso County District Court ordered the DOC to provide that treatment forthwith in case number 2009CV470. The Attorney General's office attempted to appeal that Order, but their appeal was dismissed. Mr. Spitz successfully completed treatment and was paroled on or about January 2013.

91. Mr. Spitz' current parole officer is Kyli Simms.

92. On or about October 7, 2014, Ms. Simms notified Mr. Spitz that his

54

urinalysis results tested positive for opiates.  Mr. Spitz has not ingested any opiates or any other illegal or unprescribed drug while on probation.  The drug test results from the laboratory relied upon by the division of adult parole is unreliable because the division too cheap to engage in confirmatory gas chromatography.  Mr. Spitz took a hair follicle test, at his own expense, which came up negative for opiates and any other drug.  However, Ms. Simms refuses to accept that test result based on her unjustified and unwarranted accusation that Mr. Spitz fraudulently used someone else's hair.  The private laboratory is not so unprofessional as to not collect the hair sample directly from the testee and insure the identity of the person providing the hair sample.  Ms. Simms refuses to permit Mr. Spitz to take a hair follicle test under circumstances where she will agree to accept the results.

93.    As a result of the allegedly failed drug test, Ms. Simms informed Mr. Spitz that she has the discretion to "sanction" him and that her decision is "final." She informed Mr. Spitz that if he has any "unexcused" absence from treatment or fails a polygraph examination that she will "sanction" him by putting him in jail for three days.  She has no authority to do this, and if she does manage to accomplish this, it will be because she is abusing the procedures set forth in CRS 17-2-103.  CRS 17-2-103(1)(e) gives Ms. Simms the authority to arrest Mr. Spitz when she "has probable cause to believe that the parolee has violated a condition of his parole."  Pursuant to CRS 17-2-103(5), if Ms. Simms arrests Mr. Spitz, then she has ten working days to either file a revocation complaint with the parole board or release him.  Therefore, she has interpreted this statute to give

55

her the defacto authority to simply arrest Mr. Spitz when she has no intention of filing a revocation complaint in order to release him in less that ten working days as a "sanction."

**FIRST CLAIM  RELIEF FOR DECLARATORY AND INJUNCTIVE RELIEF pursuant to 42 USC §1983 – For violations of the First and Fourteenth Amendments to the US Constitution by the Plaintiffs against the Defendants**

94.    Steven Christiansen, Misty Christiansen, S.C., Harold Dean Groves, Marsha Groves, David Zayatz, Erin McClanahan, R.M., Eric Petersen, Wesley Specht, Jessica Specht, and Earl Cooley have a First and Fourteenth Amendment right to familial association, to live together as families or while in the DOC or on parole on the telephone and in person visitation, with their spouses, children, grandchildren and other family members.   This First and Fourteenth Amendment right to familial association cannot be restricted simply because of a "sex offender" designation or a decades old sex offense conviction.    The Defendants sued in their official capacities continue to impose these arbitrary and irrational restrictions upon Steven Christiansen, Misty Christiansen, S.C., Harold Dean Groves, Marsha Groves, David Zayatz, Erin McClanahan, R.M., Eric Petersen, Wesley Specht, Jessica Specht, and Earl Cooley.

a.    Mr. and Mrs. Christiansen and S.C. are entitled to an injunction against Chris Kline prohibiting her from continuing to enforce her unconstitutional policy that Mr. Christiansen may not parent his daughter and Mrs. Christiansen will lose her parental rights if she allows her daughter's father to have contact with her baby in violation of their First and Fourteenth Amendment right to familial association.   Mr. and

56

Mrs. Christiansen are entitled to an injunction against Caire Krol, in her official capacity as Supervisor for Adams County Department of Human Services Child Abuse Records and Appeals Programs, compelling her to remove the "red flags" that were placed under their names in the TRAILS system for confirmed allegations of child neglect. Neither Plaintiff neglected S.C. by allowing her natural father to parent her.

b.    Mr. Petersen is entitled to an injunction against Ms. Phillips and the parole board prohibiting them from continuing to violate his First and Fourteenth Amendment right to familial association with his autistic daughter whom he has never even met.

c.    Mr. and Mrs. Specht are entitled to an injunction against Mr. Raemisch prohibiting the DOC from continuing to violate their First and Fourteenth Amendment right to familial association with each other and other friends and family members.

d.    David Zayatz, Erin McClanahan and R.M are entitled to an injunction against Mr. Raemisch, the parole board and Matt Carey prohibiting the DOC and the parole board from continuing to violate their First and Fourteenth Amendment right to familial association with each other and their daughter.

e.    Earl Cooley is entitled to an injunction against Ms. Sage and the parole board prohibiting them from continuing to violate his First and Fourteenth Amendment right to familial association with his daughter and the grandchildren he has never even met.

f.      Mr. and Mrs. Groves are entitled to an injunction against Cheryl Ternes prohibiting her from continuing to enforce her unconstitutional policy that sex offenders, who have discharged their sentences, may not have contact with their minor family members unless they are in offense specific treatment, in violation of their First and Fourteenth Amendment right to familial association.  Additionally, Mr. and Mrs. Groves are entitled to an injunction against Kelly Holtz, Alison Bettenberg and Sarah Yarbrough prohibiting them from arbitrarily and capriciously denying them their Fourteenth Amendment right to familial association, and their First Amendment right to be present in a public forum just because their grandsons are also present in that public place.

g.      Mr. and Mrs. Groves have a First and Fourteenth Amendment right to petition the federal court for redress of grievances, and cannot be intimidated by the threat of being held in contempt by a state court judge for doing s.  They are entitled to an injunction against Robert Lung prohibiting him from holding them for holding any party to this litigation in contempt if they request or disclose pleadings and documents from the dependency and neglect case pursuant to FRCP Rules 26(a)(1)(A), 33 or 34.

95.     If the Defendants named in the above paragraph think they are required to restrict the Plaintiffs' ability to live with their family members, speak to their family members on the telephone or have family members visit them by virtue of any policy, standard or guideline promulgated by the Defendant SOMB

board members, then the SOMB board members have violated these Plaintiffs'

First and Fourteenth Amendment rights to free speech and familial association.

These Plaintiffs are entitled to a Declaration that any such policy, standard or

guideline violates the First and Fourteenth Amendment and to prospective

injunctive relief enjoining the enforcement of any such unconstitutional policy,

standard or guideline.

96.     As set forth in *Miller v. Alabama,* 132 S.Ct. 2455 (2012), *Jackson v.*

*Hobbs*, 132 S.Ct. 548 (2012) and *Graham v. Florida*, 130 S.Ct. 2011, 2030

(2010), it violates a juvenile offender's Eighth Amendment right to be free from

cruel and unusual punishment to sentence a juvenile offender to imprisonment

for life without the opportunity for parole.  Mr. Shields is entitled to an injunction

against the parole board members enjoining them from remanding him to the

DOC for the remainder of his life without the possibility of parole in the future

without first giving him procedural due process and an individualized sentencing

hearing.   The parole board revocation procedures do not comply with the

requirements of the individualized sentencing hearing as required by *Miller v.*

*Alabama,* 132 S.Ct. 2455 (2012).  A parole revocation hearing takes less than 10

minutes, the hearing officer gets annoyed when it takes longer and will cut off the

parolees' evidence, the parole has no ability to subpoena witnesses or

documents or even cross examine the witnesses against him.  Evidence against

the parolee is often second and third degree hearsay, presented in narrative by

the parole officer as part of his or her closing statement without the ability to

cross examine the declarants.  There is no ability to present any expert testimony

at a parole revocation hearing, and the hearing is never scheduled with enough advance notice so that the parolee can even line up expert witnesses. The parolee is not allowed to attend the revocation hearing in person, he is on a speaker phone in a jail hundreds of miles away in Washington or Park County and has no ability to confer with counsel during the hearing. The parolee has no ability to obtain discovery from the parole officer prior to the hearing.

97.   The parole officers and parole board have a policy that if a parolee who is designated as a "sex offender" either does not get accepted into sex offender treatment or is kicked out of treatment once accepted, then this is an automatic parole violation. The parolee will be arrested and held in jail, sometimes for months, and then given a hearing and revoked to the DOC. This violates the Plaintiffs' constitutional rights for the following reasons: The Plaintiffs are seeking a court order that they have a First and Fourteenth Amendment right to familial association. However, the SOMB certified treatment providers take the position that SOMB Guidelines require them to refuse treatment to any offender who has contact with family members who is a "victim" or who is under the age of 18. Therefore, if Earl Cooley, Eric Petersen or Wesley Specht successfully obtain an Order from this Court prohibiting the enforcement of this unconstitutional SOMB policy, then the treatment providers will deny them treatment. The parole officers and parole board will then accomplish through the back door what they cannot accomplish through the front door and revoke terminate them from offense specific treatment or terminate their parole for not being in sex offender treatment. Earl Cooley, Eric Petersen and Wesley Specht

are entitled to a Declaration that any such policy, standard or guideline of the SOMB and/or Parole Board violates the First and Fourteenth Amendment and to prospective injunctive relief enjoining the enforcement of any such unconstitutional policy, standard or guideline.

98.    Earl Cooley, Eric Petersen and Wesley Specht are entitled to an injunction compelling the SOMB to direct SOMB treatment providers to provide treatment to these Plaintiffs if this Court grants these Plaintiffs an injunction prohibiting the enforcement of the unconstitutional SOMB policy prohibiting contact with any family members who is a "victim" or who is under the age of 18. SOMB treatment providers will refuse to provide the treatment in the absence of a variance or directive from the SOMB to provide treatment in violation of the SOMB policy of prohibiting contact with any family members who is a "victim" or who is under the age of 18; but the SOMB has the ability to either change their policy or issue a variance with respect to any of the individual Plaintiffs. SOMB member (and Defendant) Missy Gursky's position is that the federal cannot tell the SOMB what to do; however, that is incorrect. This Court has jurisdiction pursuant to 42 USC 1983 and FRCP Rule 65 to enjoin the SOMB members.

99.    Mr. Spitz is entitled to an injunction against Ms. Simms prohibiting her from relying on any drug test results, when she refuses to accept a more accurate hair follicle test and/or refuses to permit hair follicle testing, to restrict Mr. Spitz' liberty. Additionally, he is entitled to an injunction against her prohibiting her abusing her authority pursuant to CRS 17-2-103 and arresting him

61

with the intention of providing one of her described three day "sanctions" in jail, without first providing him procedural due process.

100.    The Plaintiffs are entitled to attorney fees and costs pursuant to 42 USC §1988.

**SECOND CLAIM**
**FOR NOMINAL, COMPENSATORY AND PUNITIVE DAMAGES pursuant to 42 USC §1983 – By Jonathan Shields, Steven Christiansen, James Kerns, Harold Dean Groves, Marsha Groves, Ashley Clark and Christopher Clark for violations of the Eighth and Fourteenth Amendments to the US Constitution against the Defendants sued in their Personal Capacities.**

101.    Ms. Duncan has damaged Mr. Shields and Ms. Dawes has damaged Mr. Christiansen in an amount to be determined at trial for violations of their Eighth Amendment right to be free from cruel and unusual punishment.  Mr. Shields suffered enormous emotional distress from July 29 until August 25 by being forced to live in a room without adequate plumbing that was infested with bed bugs such that he was covered in bites, and not even being allowed to go to a convenience store and buy bug spray.  He suffered enormous emotional distress by being isolated from his parents and other adult family members without a rational or legitimate penological purpose for denying him familial association while being subjected to these Eighth Amendment violations.  Mr. Christiansen suffered enormous emotional distress from September 9 until October 7, 2015 by being forced to live in a room without adequate plumbing that was infested with rodents.  Ms. Duncan and Ms. Dawes acted with actual malice in recklessly subjecting Mr. Shields and Mr. Christiansen to cruel and unusual punishment by forcing them to live in a dive motel infested with vermin and not allowing them to leave to obtain food.

102.  Amy Tate has damaged James Kerns in an amount to be determined at trial by forcing him to be homeless while on parole instead of living with his family.  It violated his Fourteenth Amendment right to familial association to deny him his right to live with his family just because he had a decades old sex offense conviction.  Ms. Tate acted with actual malice in recklessly forcing Mr. Kerns to be homeless the entire time he was on parole.

103.  Matthew Sullivan and Miranda Kinnettt have damaged Mr. and Mrs. Clark in an amount to be determined at trial for violations of their Fourteenth Amendment right to familial association by prohibiting all contact with each other from March 2 - June 20, 2014.  Matthew Sullivan and Miranda Kinnettt acted with actual malice in denying the Clarks' right to familial association and treating Mr. Clark as if he were a sex offender when he is not a sex offender.  They acted with actual malice in recklessly denying them the right to associate with each other as husband and wife and for punishing them for getting married in violation of their constitutional right to do so.

104.  Steven and Misty Christiansen were damaged in an amount to be determined at trial, for their emotional distress, by the unconstitutional actions of Amanda Jurden, Chad Herrera and Rick Shilling in denying them their Fourteenth Amendment right to familial association with their infant daughter and threatening to take their daughter away just because Mr. Christiansen is a registered sex offender.  Mrs. Christiansen wakes up terrified every day that today will be the day that the Adams County DHS knocks on her door and takes her daughter away.  Chad Herrera had no right to demand that she find another

husband and that she could "do better."  Her choice of spouses is none of his business, and her husband has done nothing to harm her daughter, as Mr. Herrera very well knew.  These three defendants acted with actual malice in recklessly threatening to take their daughter away in violation of their constitutional rights.

105.   Harold and Marsha Groves were damaged in an amount to be determined at trial, for their emotional distress, by the unconstitutional actions of Kelly Holtz, Alison Bettenberg and Sarah Yarbrough in denying them their Fourteenth Amendment right to familial association with their grandsons, by prohibiting them from visiting their grandson in the hospital and denying Mr. Groves the ability to attend public events also attended by his grandsons just because Mr. Groves is a registered sex offender.  These three defendants acted with actual malice in recklessly violating their constitutional rights.

106.   The Plaintiffs are entitled to their attorney fees and costs pursuant to 42 USC 1988.

**THIRD CLAIM**
**FOR NOMINAL, COMPENSATORY AND PUNITIVE DAMAGES for Plaintiffs' pendent state law claims for relief against the Carriage Inn and Motel 9 by Jonathan Shields and Steven Christiansen.**

107.   Mr. Shields and Mr. Christiansen were Invitees of Defendants Carriage Inn and Motel 9 within the meaning of CRS 13-21-115(5)(a).

108.   The Carriage Motor Inn is such a dump and is so dilapidated that a tenant cannot operate both the heater in the room and plug a hot plate or electric skill into the wall outlet without tripping the circuit breaker.  Prior to December 28,

2011, other parolees called the City of Aurora Code Enforcement because sewage was backing up in the shower, the motel was infested with mice and Mr. Kim refused to turn on the heat unless the ambient temperature dropped to 32 degrees or lower.  This angered Mr. Kim.  The Carriage Inn remained infested with vermin with inadequate plumbing, sewage overflow and broken appliances when Mr. Shields was forced to move in two and a half years later.  Mr. Kim took no steps to clean up the Carriage Inn, fix the plumbing and appliances and provide a clean and safe environment for his tenant parolees who are forced to stay at his motel.  Instead, he abused them by forcing them to work for him for free and provide maid and maintenance services at Carriage Inn.

109.   The Motel 9 is also a dilapidated dump.  In January 2012, a Yelp reviewer wrote as follows:  "This motel is AWFUL. The management is rude and abusive….   This motel has bed bugs and is very filthy.   The abusive management has ZERO compassion and ZERO remorse.  The management lies and denies any bed bugs. This a real problem that will only continue with management that denies and lies about their bed bug issues. The abusive attitude from the management was an awful experience.  Their yelling and the blame game was out of control.  The management is abusive to disabled people. I have absolutely NOTHING positive to say about my stay."

110.   From January 2012 until May 2012, the Motel 9 remained infested with vermin and with inadequate plumbing, sewage overflow and broken appliances when Mr. Christiansen was forced to move in two and a half years later.   Motel 9 took no steps to clean up the vermin, fix the plumbing and

appliances and provide a clean and safe environment for its tenant parolees who are forced to stay at the motel.  Instead, Motel 9 abused them by forcing them to sleep on feces infested and vermin infested mattresses and threatened to make trouble with their parole officers if they complained.

111.    Motel 9 and Carriage Inn owe a duty to their invitees to provide clean safe rooms without broken windows and with adequate plumbing.  Motel 9 and Carriage Inn breached this duty to the Plaintiffs and are therefore liable to the Plaintiffs for their negligence causing injuries.  The Plaintiffs have been damaged in an amount to be determined at trial.

### FOURTH CLAIM
### FOR NOMINAL, COMPENSATORY AND PUNITIVE DAMAGES for Mr. Shields' pendent state law claim for relief against the Phoenix Center

112.    Phoenix Center owed Mr. Shields a duty of care to safeguard his personal belongings, knowing that Mr. Shields was incarcerated and had no immediate way to retrieve his wallet and other personal belongings.  While the Phoenix Center did not have an unlimited duty to keep Mr. Shields' belongings indefinitely, Phoenix Center had a duty to not randomly release Mr. Shields' belongings to an individual who was fraudulently masquerading as Mr. Shields' family member.  The Phoenix Center had a duty to not randomly release Mr. Shields' belongings to a third party without making a reasonable inquiry as to whether the party had Mr. Shields' permission to obtain possession of his belongings.  Phoenix Center breached this duty by releasing Mr. Shields' belongings to a stalker who was masquerading as Mr. Shields' fiancée without checking the stalker's identification and credentials to obtain possession of Mr.

Shields' belongings.   Phoenix Center is liable for its negligence causing injury, and Mr. Shields has been damaged in amount to be determined at trial.

113.   In the alternative, Mr. Shields and Phoenix Center created a bailment when Phoenix Center accepted Mr. Shields into the halfway house and took control over his personal belongings.   Even if the Phoenix Center is considered to be a gratuitous bailee, a gratuitous bailee owes a limited duty of care to the bailor and to not randomly relinquish control of the chattels to some random third party not authorized by the bailor to take possession of the property.   Mr. Shields has been damaged in an amount to be determined at trial.

**The Plaintiffs demand a jury trial on the Second, Third and Fourth Claims for Relief**

**WHEREFORE,** the Plaintiffs pray for entry of judgment against the Defendants as follows:   (1)  for nominal, compensatory and punitive damages against Jennifer Duncan, Theresa Dawes, Amy Tate, Kelly Holtz, Alison Bettenberg, Sarah Yarbrough, Amanda Jurden, Chad Herrera, Rick Shilling, the Carriage Inn, Motel 9, Matthew Sullivan and Miranda Kinnett and the Phoenix Center; (2) for a declaration against the Defendants in their official capacities that their actions violated the Plaintiffs' First, Eighth or Fourteenth Amendment Rights; (3) for an injunction against all the Defendants sued their official capacities to prevent future violations of the Plaintiffs' First and Fourteenth Amendment rights; (4) for the Plaintiffs' attorney fees and costs; and (5) for all other relief that the Court deems just and proper to punish the Defendants'

flagrant violation of the United States Constitution and to prevent future violations.

DATED April 15, 2015.

Respectfully submitted,

/s/ Alison Ruttenberg

Alison Ruttenberg
PO Box 19857
Boulder, CO  80308
(720) 317-3834
Fax:  (888) 573-3153
Ruttenberg@me.com

**Attorney for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2015, I efiled via ECF, a true and correct copy of the foregoing **THIRD AMENDED COMPLAINT** to all opposing counsel who have entered an appearance.  Any new Defendants will be served pursuant to FRCP Rule 4 after the Court accepts this third amended complaint.